Stephen L. BISHOP, Plaintiff,

v.

FAIR LANES BOWLING,
INC., Defendant.

Deborah A. SMITH and Randy L.
Smith, Plaintiffs,

v.

FAIR LANES BOWLING,
INC., Defendant.

Civ. A. Nos. C84–1531A, C84–1532A.

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 19, 1985.
As Amended Jan. 15, 1986.

Gary S. Freed, Labovitz, Rosenberg &
Campbell, Atlanta, Ga., Chester G. Rosenberg, Labovitz, Rosenberg & Campbell, for
plaintiff.

Lowell S. Fine, Atlanta, Ga., for defendant.

ORDER

ROBERT H. HALL, District Judge.

Plaintiffs bring the above-styled actions
essentially alleging that defendant was
negligent in failing to ensure the safety
and welfare of plaintiffs Stephen L. Bishop
and Deborah A. Smith while they were
invitees on defendant's premises, a bowling
alley located in Norcross, Gwinnett County,
Georgia.[1]  Specifically, plaintiffs allege
that defendant failed to conform to the

1. The two actions were consolidated by this court on December 11, 1984.

standard of conduct required of it when it continued to serve alcoholic beverages to visibly intoxicated persons who had displayed aggression toward plaintiffs Stephen Bishop and Deborah Smith, when it failed to control the actions of dangerous intoxicated persons, when it failed to provide adequate security personnel at the premises, especially in the parking lot immediately after closing, and when it allowed the parking lot lights to turn off automatically 10 minutes after closing. (*See* plaintiffs' response brief, pp. 5–6, summarizing plaintiffs' claims).

Presently pending is defendant's motion for summary judgment.[2]

## FACTS[3]

Plaintiffs Stephen L. Bishop and Deborah A. Smith attended the "Midnight Madness" bowling session at Fair Lanes Georgia Bowling ("Fair Lanes") on May 14, 1953, arriving at approximately 1:00 a.m.. (Bishop Deposition, pp. 24–25).

The bowling alley had facilities to sell refreshments, including alcoholic beverages, to its patrons.

After bowling for approximately 50–55 minutes, plaintiff Deborah Smith noticed that her pitcher of beer was missing. (D. Smith Deposition, p. 20). She then inquired of certain persons bowling in the lane to her right as to whether they had seen what had happened to the missing pitcher of beer. (Smith Deposition, pp. 21–22). Three of these other persons are now known as Janet Eldridge, Randall Eldridge, and Steven Burke ("the Burke group"). (M.S. Burke Deposition, p. 26). Neither the plaintiffs nor the managers on duty that night at Fair Lanes knew of or could recall having seen any member of this group at Fair Lanes previously. (D. Smith Deposition, p. 21; Bishop Deposition, p. 35; Swanson Deposition, p. 19; Goodin Deposition, p. 52).

Earlier in the evening, the Burke group had met at a local restaurant at approximately 6:00 to 7:00 p.m. for dinner. (R. Eldridge Deposition, p. 25). Members of the Burke group drank beer continuously through dinner, and throughout the course of the evening until the bowling alley closed at 2:30 a.m.. (J. Eldridge Deposition, p. 41; R. Eldridge Deposition, pp. 49–50; M.S. Burke, Deposition, p. 20). As a result, Randall Eldridge, Janet Eldridge and Steven Burke were visibly intoxicated when they purchased beer by the pitcher at Fair Lanes. (S. Burke Deposition, pp. 34–35; R. Eldridge Deposition, p. 41; J. Eldridge Deposition, p. 40).

After plaintiff Deborah Smith's inquiry, the members of the Burke group then walked over to Bishop and Deborah Smith's lane and began a loud conversation.

Janet Eldridge came to within 4–5 inches of Deborah Smith's face and began speaking loudly to her, asking her if she and Bishop were accusing the Burke group of taking the pitcher of beer, asking if she and Bishop thought the Burke group couldn't afford their own beer, and asking Smith if she and Bishop wanted to bowl a game for a pitcher of beer. (D. Smith Deposition, pp. 38–39).

Randy Eldridge, in a "threatening" and "slurring" manner, asked if Smith and Bishop wanted to "go outside and resolve the matter." (D. Smith Deposition, p. 29).

Bishop perceived the Burke group to be "defensive", "aggravated", and "real disturbed" over being asked about the missing pitcher of beer. (Bishop Deposition, pp. 44, 63).

---

2. Defendant entitles its motion a "motion for partial summary judgment" yet requests that judgment be entered for it on all of plaintiffs' claims.

3. This statement of facts was compiled from plaintiffs' and defendant's respective statements of undisputed facts as well as from references to facts in the various briefs for which there is uncontroverted supporting evidence. All conflicting evidence was construed in plaintiffs' favor. Irrelevant undisputed facts were omitted. Where plaintiffs' counsel's characterization of the evidence did not reflect the evidence but reflected his own opinion as to what the evidence shows, the court, of course, relied on the evidence cited.

This conversation lasted anywhere from several minutes to 30 minutes. (Bishop Deposition, p. 57; M.S. Burke Deposition, p. 24). There is no evidence that any employee of defendant overheard or witnessed this confrontation.

After this confrontation ended, the Burke group returned to their lanes. (M.S. Burke Deposition, pp. 49–50). Thereafter, Bishop and Deborah Smith walked to the front counter to tell the manager on duty what happened. (D. Smith Deposition, pp. 40–41, 65–66; Bishop Deposition, pp. 69–71). Both Bishop and Smith specifically told the manager that the Burke group was intoxicated and being "loud", "unruly" and "making a lot of commotion", that they suspected that the Burke group had taken their pitcher of beer, that the Burke group had acted "aggressive" towards them, and that the Burke group was making Deborah Smith "uneasy" and "uncomfortable." (D. Smith Deposition, pp. 41–42, 59–60, 66; Bishop Deposition, pp. 69–70). Bishop and Smith specifically requested the manager to watch the Burke group for the rest of the evening. (D. Smith Deposition, pp. 40–41, 59–60; 65–66; Bishop Deposition, pp. 69–70).

Neither Bishop nor Smith told the manager that they were in fear of bodily harm or asked him to make the Burke group leave the bowling alley or even change lanes. (D. Smith Deposition, pp. 41–42; Bishop Deposition, pp. 70–71).

Plaintiffs Bishop and Deborah Smith then returned to their lanes and continued to bowl until the bowling alley closed, approximately one-half hour later.

The Burke group thereafter proceeded to "harass", "taunt", and "cause a difficult time" for Bishop and Smith until the bowling alley closed. (Bishop Deposition, pp. 57–64; D. Smith Deposition, pp. 25–30). This "harassment" consisted of staring and making comments, loudly enough so that Bishop and Smith could hear them but not directly to them, such as "we better watch their [Bishop and Smith's] beer and make sure no one takes it", "we hope nobody takes our beer", "maybe we should go tell

the manager," "who do they [Bishop and Smith] think they are." (Bishop Deposition, pp. 57–58, 63; D. Smith Deposition, pp. 23–24). On at least one occasion, one member of the Burke group called Deborah Smith a "bitch" for accusing the Burke group of taking her beer. (D. Smith Deposition, pp. 23–24, 26). The Burke group also again challenged Smith and Bishop to a bowling game for a pitcher of beer and came over to their lane on several occasions to ask them what happened to their pitcher of beer. (D. Smith Deposition, p. 26). Bishop also heard Randy Elridge say he took the pitcher of beer intending for him and Smith to hear. (Bishop Deposition, p. 59).

As the bowling alley closed, Steve Burke approached Smith and Bishop and asked them sarcastically if they wanted half a pitcher of beer. When Bishop declined Burke retorted "look, I didn't steal your pitcher of beer." Bishop then said he had overheard Burke's friend say he took the pitcher of beer and that Burke ought to teach his friends some manners. Burke replied that he didn't know about his friends but he didn't take it, adding, in a belligerent tone, that if somebody had taken his beer and he knew who did it, he'd "beat ass", but that if anyone tried to hurt his friend, he would also "beat ass" to help him out. (Bishop Deposition, pp. 53–54, 65–66, 71; D. Smith Deposition, pp. 25–28). Bishop did not take this comment in anyway as a challenge by Burke to get into a fight or an altercation, but as a warning that if Bishop didn't leave Burke alone, Burke would "take him outside." (Bishop Deposition, p. 55).

At no time during the night did any member of the Burke group raise a fist to Bishop or Smith, make obscene gesters, touch Bishop or Smith, or otherwise use any threatening nonverbal form of communication. (Bishop Deposition, pp. 59–60). At no time did any member of the group explicitly threaten Bishop or Smith with physical harm. (Bishop Deposition, p. 74).

Neither the manager nor any other employee of Fair Lanes spoke to the Burke

group about their behavior. In fact, neither Bishop, Deborah Smith or anyone in the Burke group noticed anyone from Fair Lanes monitoring their actions. (Bishop Deposition, p. 102; D. Smith Deposition, pp. 60, 65; S. Burke Deposition, p. 60; M.S. Burke Deposition, p. 27; J. Eldridge Deposition, pp. 48–49; R. Eldridge Deposition, p. 49).

The Burke group departed at approximately 2:30 a.m.. While the Burke group had said nothing to make Bishop think they would be waiting outside, Bishop and Smith waited five to ten minutes thereafter to avoid any possible additional problems with the Burke group in the parking lot. (Bishop Deposition, pp. 72, 74–75; D. Smith Deposition, pp. 31–36). An employee of defendant locked the doors behind Bishop and Smith as they departed since they were the last persons to leave the premises. (Bishop Deposition, pp. 109–111; D. Smith Deposition, pp. 60–61). Neither Bishop or Smith expressed to this employee any fear of a physical attack by the Burke group in the parking lot or elsewhere. The employee did not monitor the parking lot as Bishop and Smith departed.

In the parking lot, between 2:30 a.m. and 2:45 a.m., Bishop and Smith were confronted and accosted by the Burke group while they were getting in their car, and both Bishop and Smith were severely beaten. (Bishop Deposition, pp. 75–83; D. Smith Deposition, pp. 46–50). Smith ran to the front door while being chased by Janet Eldridge, and banged on the door to alert the employees of the bowling center. The manager responded and allowed Smith to enter the premises and call the police. (D. Smith Deposition, pp. 49–50; M.S. Burke Deposition, p. 38). Bishop was repeatedly struck in the face by Stephen Burke until the point of unconsciousness. (S. Burke Deposition, pp. 72–73; J. Eldridge Deposition, p. 55).

Either just prior to or during the altercation, the parking lot lights turned off, having been set on an automatic timer. (Goodin Deposition, p. 72; Exhibit A to plaintiffs' response brief).

Prior to this incident, there had never been a physical altercation between customers of the bowling alley in the parking lot. The only previous problems in the parking lot concerned the theft of hubcaps, loitering and "rowdiness". (Exhibit A to plaintiffs' response brief; Barone Deposition, pp. 27–28; Goodin Deposition, pp. 42–44).

Plaintiffs filed the instant actions against Fair Lanes on August 2, 1984. Plaintiffs seek recovery for medical expenses, lost wages, pain and suffering, punitive damages (for plaintiffs Deborah Smith and Bishop) and loss of consortium damages (for plaintiff Randy Smith).

Since the incident in defendant's parking lot, one member of the Burke group has been convicted of criminal charges as a result of the attack on Bishop and Smith and criminal charges are presently pending against the two other members of the group.

## DISCUSSION

Defendant moves for summary judgment on essentially two grounds. First, it submits that as a matter of law it has no tort liability for continuing to serve alcoholic beverages to the persons who intentionally assaulted plaintiffs Bishop and Smith. Second, it argues that there is no genuine dispute that it did not have the requisite knowledge of the "hazardous condition" on its premises leading to plaintiffs to make it liable for not protecting plaintiffs from this condition.

A. *Tort liability for continuing to serve alcoholic beverages to noticeably intoxicated persons*

1. *Cause of action*

The first question raised by defendant's motion, simply stated, is as follows: is a person who sells or furnishes alcoholic beverages to a noticeably intoxicated person liable in tort to a third person who is subsequently injured by the *intentionally* tortious or criminal act of the intoxicated person?

Until recently, the answer to this question would have clearly been a resounding "no" as the case of *Riverside Enterprises, Inc. v. Rahn,* 171 Ga.App. 674, 320 S.E.2d 595 (1984), indicates. In *Riverside Enterprises,* the Georgia Court of Appeals, commenting on the general state of the law surrounding the liability of sellers of alcoholic beverages, stated that "for at least 94 years it has been the law of this State that the statute prohibiting the sale of alcoholic beverages to noticeably intoxicated persons [currently Ga. Off'l Code Ann. § 3–3–22] does not create any civil liability on the part of the sellers of alcoholic beverages...." and that the General Assembly " 'still has not enacted any legislation imposing such civil liability....' " *Id.* at 675, 320 S.E.2d 595, *quoting Nunn v. Comidas Exquisitos, Inc.,* 166 Ga.App. 796, 305 S.E.2d 487 (1983). In support of this statement, the court cited the 1890 Georgia Supreme Court decision in *Belding v. Johnson,* 86 Ga. 177, 179–81, 12 S.E. 304 (1890), which has been characterized as holding that neither the common law of Georgia nor any statute in effect at that time created tort liability on the part of a tavern owner for selling alcoholic beverages to an intoxicated person. 171 Ga.App. at 675, 320 S.E.2d 595.[4]

The *Riverside Enterprises* court's statement of the law with respect to the civil liability of a seller of alcoholic beverages has been cast into doubt, however, by a recent decision of the Georgia Supreme Court. In *Sutter v. Hutchings,* 254 Ga. 194, 327 S.E.2d 716 (1985), the Supreme Court held that because the statutes prohibiting the furnishing of alcoholic beverages to a noticeably intoxicated person and to a person under 19 years of age (Ga. Off'l Code Ann. §§ 3–3–22 and 3–3–23(a)(1)) were enacted to "protect third parties as well as those noticeably intoxicated and under 19," a cause of action against the provider of alcoholic beverages to a noticeably intoxicated minor, by any party injured by the provision of such beverages to the intoxicated minor, exists under Ga. Off'l Code Ann. § 51–1–6. This section provides, in pertinent part, that:

When the law requires a person ... to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damages thereby.

*Id.* at 197, 327 S.E.2d 716.

The court then analyzed whether the negligence action before it satisfied the requisite proximate cause element of negligence, deciding that it did:

Under many circumstances the act which is *the* proximate cause of the damage resulting from a breach of duty relating to alcohol is the act of the consumer of the alcohol. Under such circumstances, the consumer is solely liable because the act of furnishing the alcohol is too remote to be the proximate cause of the negligence of the consumer.... That is to say, the subsequent act of the consumer is not foreseeable to the provider, or the consumption of an excessive amount of alcohol is the intervening (unforeseeable) cause of the damage.

However, where one provides alcohol to a noticeably intoxicated 17-year-old knowing that he will soon be driving his car, it is foreseeable to the provider that the consumer will drive while intoxicated and a jury would be authorized to find that it is foreseeable to the provider that the intoxicated driver may injure someone.... That is to say, a jury would be authorized to find that providing alcohol to a noticeably intoxicated 17-year-old automobile driver was one of the proximate causes of the negligence of the driver and of the injuries to the deceased....

---

4. The *Riverside Enterprises* opinion is merely the latest pronouncement by the Georgia Court of Appeals on the issue of "dramshop" liability. The Court of Appeals has stated the position taken by the *Riverside Enterprises* court on a number of occasions. *See, e.g., Nunn v. Comi-* *das Exquisitos, Inc.,* 166 Ga.App. 796, 305 S.E.2d 487 (1983); *Keaton v. Kroger Co.,* 143 Ga.App. 23, 25, 237 S.E.2d 443 (1977); *Henry Grady Hotel Co. v. Sturgis,* 70 Ga.App. 379, 385–86, 28 S.E.2d 329 (1943).

*Id.* at 197–98, 327 S.E.2d 716 (Emphasis in original) (Citations and footnotes omitted).

In an appendix to the decision, the Georgia Supreme Court discussed a number of related cases, including *Belding v. Johnson, supra,* and *Nunn v. Comidas Exquisitos, Inc., supra,* (the cases relied on by the *Riverside Enterprises* court), and then stated:

> From the foregoing, it can be seen that ... the provider of alcoholic beverages is not liable for intentional criminal acts (e.g., murder, battery) committed by the consumer upon third persons, even though the consumer was noticeably intoxicated at the time the alcohol was furnished. *Belding v. Johnson,* supra; *Nunn v. Comidas Exquisitos, Inc.,* supra. Such criminal conduct is not the foreseeable result of furnishing alcohol to another *who has displayed no aggression.*

*Id.* at 200–01, 327 S.E.2d 716 (Emphasis added).

With the Georgia Supreme Court's reliance on Ga. Off'l Code Ann. § 51–1–6, its emphasis on foreseeability, and its implicit suggestion that an intentionally criminal act could be the foreseeable result of furnishing alcoholic beverages if the consumer of the beverages had "displayed aggression," this court cannot rely on *Riverside Enterprises* and similar cases which do not reflect a consideration of this statute or the aggression displayed by the noticeably intoxicated person, but must decide the question before it with only the benefit of the *Sutter* case.

■ The court, like the *Sutter* court, begins with an analysis of the relevance of Ga. Off'l Code Ann. § 51–1–6, quoted above. This requires the court to first determine whether the statute prohibiting the sale or furnishing of alcoholic beverages to noticeably intoxicated persons, Ga. Off'l Code Ann. § 3–3–22, is a "law requir[ing] a person ... to refrain from doing an act which may injure another", as it is only such a law which would fall within § 51–1–6. Because the provision of alcoholic beverages to a noticeably intoxicated

person may very well injure another indirectly—as when the intoxicated person then drives a car, as in the *Sutter* case, or when he or she commits a crime that he or she would not have committed in a sober or less intoxicated state—the court must conclude that § 3–3–22 is a law within the purview of § 51–1–6 and that, therefore, § 51–1–6 provides a cause of action to a party injured by a violation of the duty imposed by § 3–3–22.

This conclusion does not answer the question initially posed, however. The court must now apply the "traditional formula setting forth the elements of negligence," *Sutter,* 254 Ga. at 196, 327 S.E.2d 716, in determining the limitations of the liability of providers of alcoholic beverages to noticeably intoxicated persons.

The elements of a negligence action, as stated by the Georgia Supreme Court in *Sutter,* are:

> "1. A duty, or obligation, recognized by the law, requiring the actor to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
>
> "2. A failure on his part to conform to the standard required....
>
> "3. A resonable [sic] close causal connection between the conduct and the resulting injury....
>
> "4. Actual loss or damage resulting to the interests of another."

*Id.* at 196–97, 327 S.E.2d 716, *quoting* Prosser, Law of Torts, 4th ed., § 30 (1971).

Of the four elements—duty, breach of duty, proximate cause, and actual damage—the third is very significant to the question before the court: the requirement of proximate causation requires that the subsequent intentional tortious or criminal act of the intoxicated person be the *foreseeable* result of the act of furnishing the alcoholic beverage in order to establish actionable negligence on the part of the provider of the alcoholic beverage. *Sutter,* 254 Ga. at 197–98, 198 n. 6, and 200–01, 327 S.E.2d 716.

Is an intentionally tortious or criminal act ever the foreseeable result of furnishing alcoholic beverages to another? First, the court notes that the rule that intervening intentionally tortious or criminal acts insulates a defendant from liability does not apply if those acts are foreseeable. *See Bradley Center v. Wessner,* 250 Ga. 199, 202–03, 296 S.E.2d 693 (1982), *cited favorably in Sutter v. Hutchings, supra,* 254 Ga. at 198 n. 6, 327 S.E.2d 716. When does intentionally tortious or criminal conduct become foreseeable is the real question.

Unlike the negligence which can be an expected result of drinking too many alcoholic beverages, intentionally tortious or criminal conduct by an intoxicated person is not so predictable since it is dependent upon the intoxicated person's disposition towards violence or crime, a quality not always apparent to a psychiatrist much less the average person. Nevertheless, the court can envision instances where a person's tendencies to become violent upon consuming alcohol would be, or should be, so apparent to a provider of alcohol that it would be, or should be, foreseeable to the provider that the intoxicated person may engage in intentionally tortious or criminal conduct if he or she is furnished more alcoholic beverages.[5]

So that this conclusion is not taken to mean that a jury must decide the foreseeability of an intoxicated person's "dangerousness" every time there is an allegation of a display of "aggression" by the intoxicated person, the court sets forth the *minimum* amount of evidence which it feels must be produced to warrant a finding that a subsequent intentionally tortious or criminal act was the foreseeable result of the

act of furnishing alcoholic beverages: either the plaintiff must show that the provider of alcohol knew or should have known that the intoxicated person had shown physical manifestations of violence, either toward property or toward a person, prior to but within reasonable proximity to the time the alcohol was provided; or that the provider of alcohol knew or should have known that the intoxicated person had threatened physical violence prior to but within reasonable proximity to the time the alcohol was provided, either explicitly or through language which can be construed to constitute such a threat; or that the provider of alcohol knew or should have known the intoxicated person had a tendency to become physically violent subsequent to being verbally aggressive while drinking alcohol and the provider knew or should have known that that person had become verbally aggressive prior to but within reasonable proximity to the time the alcohol was provided.

To expect a provider of alcohol to foresee the dangerousness of another under circumstances other than these would amount to imposing strict liability on that person for serving intoxicated customers.

In sum, then, the court answers the question before it with a qualified "yes"—a person who sells or furnishes alcoholic beverages to a noticeably intoxicated person can be held liable in tort to a third person who is subsequently injured by the intentionally tortious or criminal act of the intoxicated person *if* the above circumstances existed at the time the alcohol was provided.

### 2. *The instant defendant's liability*

■ While defendant has not argued that there is no genuine factual dispute

**5.** The Georgia Supreme Court also apparently envisions such occasions as evidenced by its remarks in *Sutter. See also Moone v. Smith,* 6 Ga.App. 649, 652–53, 65 S.E. 712 (1909) ("There is no allegation ... that the intoxication of the men was caused by anything that they drank upon the premises; if so, the liability of the [proprietor] would be stronger, and clearer...").

The court also notes that a close reading of *Belding v. Johnson* reveals no holding that the

intentionally tortious or criminal act of a person furnished with alcohol beverages can *never* be foreseeable by the provider of those beverages, contrary to the language of its progeny; the *Belding* court merely held that there were too many unforeseeable intervening acts between the furnishing of alcohol and the subsequent criminal act to find proximate causation. 86 Ga. at 180–81, 12 S.E. 304.

precluding the entry of summary judgment for it on plaintiffs' "§ 51–1–6/3–3–22 tort claim" (resting instead on the legal argument that Georgia does not have such a tort action), the court, from the undisputed facts established in connection with defendant's other arguments, finds that there is no genuine dispute that defendant's breach of its duty under § 3–3–22 was *not* the proximate cause of plaintiffs' injuries and thus GRANTS defendant summary judgment on plaintiffs' § 51–1–6/3–3–22 claim.

It is undisputed that defendant neither knew or should have known of the violent disposition of the Burke group. There is no evidence that defendant witnessed or should have witnessed the initial confrontation between plaintiffs Bishop and Deborah Smith and the Burke group, nor is there evidence that plaintiffs' alerted defendant to anything other than that the Burke group was being loud and verbally obnoxious, were drunk, and had stolen a pitcher of beer. There is no evidence that defendant knew or should have known of any plan on the part of, or threat by, the Burke group to inflict physical injuries to plaintiffs as there is no evidence that there was such a plan or that any threat had been made. There is no evidence that the Burke group physically manifested any violent intent during the time defendant monitored or should have monitored the Burke group's conduct.

The evidence shows only that the Burke group pestered or taunted the plaintiffs with sarcastic and mocking remarks following the initial confrontation; this can hardly be deemed sufficient to establish that the violent attack on plaintiffs was foreseeable.

B. *Tort liability for failing to exercise ordinary care in keeping premises and approaches safe.*

1. *Cause of action*

Section 51–3–1 of the Georgia Code provides:

Where an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries *caused by his failure to exercise ordinary care in keeping the premises and approaches safe.*

Ga. Off'l Code Ann. § 51–3–1 (Emphasis added).

Pursuant to this section, the Georgia courts have held that

An occupier of land is liable for injuries sustained by an invitee upon his premises through a dangerous condition created by a third person only after the occupier has knowledge of, or by the exercise of ordinary care could have discovered, the hazardous condition, and then fails to use reasonable care to eliminate it.

*Bowling v. Janmar, Inc.,* 142 Ga.App. 53, 54, 234 S.E.2d 849 (1977). In explaining this duty the Georgia Court of Appeals has stated:

If the [misconduct of an employee, customer or third person] and resulting injury happened suddenly and without warning and the defendant could not, by the exercise of reasonable care, have discovered or prevented it, there could be no recovery [under § 51–3–1]. It is also true the owner or occupant of premises which are used for business purposes is not the insurer of the safety of invitees. However, ... a jury could reasonably find that the defendant [occupant of business premises] was guilty of negligence if he could expect or anticipate violent conduct on the part of one guest toward another guest....

*Georgia Bowling Enterprises, Inc. v. Robbins,* 103 Ga.App. 286, 288, 119 S.E.2d 52 (1961) (Emphasis added).

Thus, knowledge, or a failure to exercise reasonable care in acquiring knowledge, of the dangerous condition created by a third person is a prerequisite to recovery under § 51–3–1. *See Holiday Inns, Inc. v. Newton,* 157 Ga.App. 436, 437, 278 S.E.2d 85 (1981); *Veterans Organization v. Potter,* 111 Ga.App. 201, 205, 141 S.E.2d 230 (1965).

Knowledge of the dangerous condition created by a third party can, of course, be

based on the conduct of the miscreant immediately leading up to the injurious misconduct if the conduct should have alerted the proprietor to the danger posed. *See, e.g., Adamson v. Hand,* 93 Ga.App. 5, 90 S.E.2d 669 (1955); *Hall v. Davis,* 75 Ga. App. 819, 822, 44 S.E.2d 685 (1947); *Swope v. Farrar,* 66 Ga.App. 52, 17 S.E.2d 92 (1941); *Great Atlantic & Pacific Tea Co. v. Cox,* 51 Ga.App. 880, 181 S.E. 788 (1935); *Moone v. Smith,* 6 Ga.App. 649, 65 S.E. 712 (1909).

Such knowledge can also be based on prior similar incidents, but the proprietor must have been aware of these incidents and the incidents must have been "substantially similar" to put the proprietor on notice of the "hazardous condition." *Donaldson v. Olympic Health Spa, Inc.,* 175 Ga. App. 258, 260, 333 S.E.2d 98 (1985); *Arnold v. Athens Newspapers, Inc.,* 173 Ga. App. 735, 737–38, 327 S.E.2d 845, (1985). *See also Atlantic Coast Line Railroad Co. v. Godard,* 211 Ga. 373, 379, 382, 86 S.E.2d 311 (1955); *Hewett v. First National Bank of Atlanta,* 155 Ga.App. 773, 774, 272 S.E.2d 744 (1980); *McClendon v. Citizens & Southern National Bank,* 155 Ga.App. 755, 756, 272 S.E.2d 592 (1980); *Munford v. Lay,* 134 Ga.App. 642, 216 S.E.2d 123, *rev'd* 235 Ga. 340, 219 S.E.2d 416 (1975); *Georgia Bowling Enterprises, Inc., supra.* "Substantially similar" means that the prior incident is "sufficient to attract the owner's attention to the dangerous condition...." *Pembrook Management v. Cossaboon,* 157 Ga.App. 675, 677, 278 S.E.2d 100 (1981). *See also Tolbert v. Captain Joe's Seafood,* 170 Ga.App. 26, 28, 316 S.E.2d 11 (1984); *McCoy v. Gay,* 165 Ga. App. 590, 591–92, 302 S.E.2d 130 (1983).

In this regard, it has been held that "a crime against property only is [not] so substantially similar to a crime against the person such that knowledge of a single prior occurrence of a crime of the former type is notice of the foreseeable future occurrence of a crime of the latter type." *Tolbert v. Captin Joe's Seafood, supra,* 170 Ga.App. at 28, 316 S.E.2d 11.

When there is only a failure to exercise reasonable care in acquiring knowledge of a dangerous condition and no constructive or actual knowledge of the hazard, liability can only arise if the proprietor had superior opportunity to discover the condition. If the invitee knows of the condition or has equal opportunity to know of it then there is no liability on the proprietor for failure to act. *See Arnold v. Athens Newspapers, Inc., supra,* 173 Ga.App. at 738, 327 S.E.2d 845.

## 2. *The instant defendant's liability*

■ Upon carefully considering the record, the court concludes that there is no genuine dispute that defendant did not know and had no reason to know the dangerous condition created by the Burke group, specifically, or the conditions of the parking lot, generally. Additionally, the court concludes that there is no genuine dispute that plaintiffs had an equal opportunity to discover the dangerousness of the Burke group and that, therefore, defendant cannot be liable for not "inspecting" the Burke group more than it did. Accordingly, the court finds that defendant is entitled to summary judgment on plaintiffs' claim under § 51-3-1.

Regarding the defendant's actual or constructive knowledge of the hazard presented by the Burke group, the court rests on its previous analysis of foreseeability.

Regarding the conditions of the parking lot, plaintiffs have failed to produce any evidence of "substantially similar" incidents to the one which befell them. Evidence of prior incidents of theft in the parking lot is evidence of prior crimes against *property* not against the *person* and thus is not substantially similar to the tortious attack on plaintiffs. Similarly, evidence of prior loitering and "rowdiness" is merely evidence of prior harmless disorder and was not sufficient to alert defendant to the dangerous condition created by not having security personnel and by not keeping the lights on longer.

## CONCLUSION

In conclusion, the court GRANTS defendant's motion for summary judgment.

This Order terminates this action.